I'll hear from you first. I had one preliminary question, if I may, before you launch into your argument. It's unusual for the briefs in an appeal in a public proceeding like this to be filed entirely under seal, but the clerk apparently authorized that in this case. Is that really necessary? My understanding is that there's material in the briefing that I believe that it's Berkadia who wanted to keep confidential. So you have no objection to unsealing the briefs, then? No, I didn't have an interest in sealing them. You didn't, okay. Well, I'll ask Appley then. We'll see if we can figure that out. Maybe it just happened. No, there was a motion, and the motion referred to things that were quote-unquote confidential and were apparently sealed in the district court, but there was no specificity that would explain why the entire briefing in an appeal would be sealed. So that's why I ask, but you may proceed with your argument. Thank you, Your Honor. May it please the Court, my name is Michael Gross, and I'm here on behalf of the appellant, Richard Sherman. This is a case, an appeal that arises from what I think is a very interesting claim under the False Claims Act in the district court, but the appeal, I believe, is at least as much about summary judgment procedure as it is about the False Claims Act proceedings. Mr. Sherman is an accomplished and highly regarded by everybody, including Berkadia, as best I can tell from the evidence, highly regarded underwriter specializing in federally insured mortgage underwriting. In 2012, Berkadia, which is a large commercial mortgage company with a significant HUD and federally insured loan platform, was in trouble with HUD. Their license was in jeopardy. They had experienced too much interference by their marketing personnel, their mortgage bankers, who produced the deals, with the activities of their underwriters, who are responsible for making sure that deals submitted to HUD are in compliance with federal law. And because of the difficulty that they were experiencing with HUD and the risk that their license was at, they hired Mr. Sherman, who was, as I said, highly regarded by HUD and whose reputation was for knowing the rules and following them. Mr. Sherman, by all accounts, did a spectacular job of being the HUD underwriter, eventually the chief HUD underwriter for-I'm really sorry. I apologize for that. By all accounts, Mr. Sherman did a spectacular job of serving as the underwriter. When he was hired, Berkshire was experiencing some 20 percent of loan rejections when they submitted proposals to HUD. Within a couple of years, that rate was down to 2 or 3 percent. He did exactly what Berkadia needed. He restored Berkadia's reputation and ability to deal well with HUD. And he kept on doing it. There came a point by 2016, which is the year in which he was terminated, where his adherence to the rules and his insistence on submitting loans in compliance with federal law was in the way of a renewed inclination by HUD, renewed influence at Berkshire, for the production people to be able to produce more revenue. And Mr. Sherman's-in June of 2016, Mr. Sherman's supervisor, Mr. Long, sent a memorandum basically recommending his termination, but also contemplating alternatives, including keeping the status quo, in which he said, first of all, that Mr. Sherman had done a superb job of accomplishing exactly what he was supposed to accomplish, but also that it was now time for the company to have someone who was more flexible, who would push back, who would be less rigid about compliance with the federal rules. And the subtext there, which is-the record is marbled with this evidence, is the production people, the mortgage bankers, particularly Mr. Irvin, who was the head of the mortgage bankers and a great producer in his own right, were frustrated by the necessities of underwriting as Mr. Sherman enforced them. So in the district court, Berkadia sought and obtained summary judgment. And the rationale for that summary judgment was that Mr. Sherman had failed to provide ample evidence of the fourth of four elements of a promulgation claim under the False Claims Act. The elements are, first, that the plaintiff must have engaged in protected activity. Second, that the company-the employer must have been aware of that activity. Third, that the company retaliated against the plaintiff on account of the activity. And fourth, that the activity-that the retaliation was solely motivated by the protected activity. And Judge Sippel in the district court concluded that Mr. Sherman had not adduced enough evidence for a jury to find in his favor on the fourth element. The problem with that is that this was summary judgment. This wasn't trial. And in summary judgment, as the district court correctly recognized, there doesn't have to be conclusive proof that the motivation-that the sole motivation for termination or for the retaliation was the engagement in protected conduct. There just has to be some evidence that the retaliation, in this case termination, was motivated by Mr. Sherman's engagement in protected conduct. Well, in the summary judgment context, and you're sitting there as the trial judge, isn't the real question really that you're asking yourself, is there an absence of evidence from which a jury as a matter of law would be unable to find that it's the sole motivation? So if there's significant evidence of other motivation such that no rational juror could ignore it, wouldn't that be sufficient to sustain the summary judgment? Well, I think that-I would say that Judge Sippel got that proposition of law right when he said there needs to be some evidence from which a juror could find that retaliation was the sole purpose. And he picked apart the-he analyzed the evidence that Mr. Sherman was relying on item by item. And with respect to each item, he rejected the notion that that item was-that that represented retaliation. So your contention is that he weighed the evidence as opposed to just looking at all the evidence and making that kind of global determination that there was such a paucity of evidence that no reasonable juror could have found sole motivation? That's an important aspect of my position that he-that Judge Sippel weighed the evidence. But the overall position that Mr. Sherman would have in this court would be that when you do look at the global picture, when you look at what his-at his history and his role at the company and the company's pattern of what it needed and how it was going to behave from time to time beginning 2012 and going on through 2016, what you see-if we were-if we saw this-the timeline of this evidence in a movie, you'd know where the movie was headed. He's going to get fired because the people who are producing the revenue consider him to be in the way and they have gained sway within the company again by 2016. The evidence-the record is replete with evidence of Mr. Sherman's engagement in protected activity. That was his job. He's the cop. And his job is to make sure that there is compliance with federal law. From the time he was hired right through the time that he's fired. Where things went south for him was-began in 2005. With Mr. Irvin, the head production guy, there was always friction. As the head of the company said, and we quoted this I think at the beginning of the brief, there's always going to be tension between the production people who are bringing in the revenue and making commissions on it and the underwriting people whose job is to make sure that the deals actually comply with federal law. And where things went-began going bad for Mr. Sherman is when he got crosswise with Mr. Long in 2015. May, June, July 2015 and thereafter. That particular incident, that's briefed as the Rancho Project, that was a case where Robert Malone was under submission to HUD for federal insurance. The way that works is you submit the loan to HUD for federal insurance. If HUD approves, then FHA guarantees the loan. And if the borrower defaults, then the lender, Bercadia, gets to collect the loan from the federal government. So it's a wonderful business model, but it does require compliance with federal law. That's the only way it works. In 2015, they had the Rancho Project going on, and the Rancho Project included a bridge loan. A bridge loan is some interim financing that can be part of the overall loan package, and that doesn't disqualify a loan for federal insurance, provided that it's disclosed and disclosed properly. Along the way, in the spring of 2015, Mr. Long, who happened to, in addition to being Mr. Sherman's supervisor, also was in charge of Bercadia's internal bridge loan operation, where Bercadia would actually make the bridge loans, and advised Mr. Sherman that the bridge loan that was already part of the package might be expanded. The borrower wanted to get another $10 million in the bridge loan. And Mr. Sherman told him, if that happens, we'll need to disclose that to HUD. The expansion of the bridge loan did happen. It happened on June 26th. The loan closed on June 26th. Mr. Sherman didn't learn about that, according to his testimony, until July 10th of 2015. And Mr. Sherman became confronted with Mr. Long about Mr. Long having withheld that information from him until after the firm commitment was obtained from HUD, which happened on July 9th. Mr. Sherman wrote an email to Mr. – I'm sorry, on July 10th. On July 9th – I may be confused about the July 9th and July 10th, but July 10th is when the issue was precipitated between Mr. Sherman and Mr. Long. Mr. Sherman accused Mr. Long – questioned Mr. Long about whether he had intentionally withheld the information that needed to be disclosed to HUD because HUD might consider that additional bridge loan to increase the risk too much. It also is important when you have the bridge loan that HUD know exactly what the nature of the underlying lending practices are so that they can assess the risk properly. The confrontation between Mr. Sherman and Mr. Long escalated. There was a point in the summer of 2015 where Mr. Sherman went to the Board of Directors, talked with two members, and expressed his concern about the details of this transaction. And they suggested that he go back to Mr. Long. He went back the same day and met with Mr. Long, asked him if he had intentionally withheld the information. Mr. Long stormed out of the room. In due course, Mr. Long, who had said earlier that Mr. Sherman is the man for this job and praised him very consistently, wrote a memo saying, I wonder if Mr. Sherman is the right guy for the job. And very soon after this confrontation, Mr. Irvin, who was the head of production and had this friction with Mr. Sherman, wrote to the head of HR in Borkadia and said, would it be a problem if we fired Mr. Sherman? Mr. Sherman continued to do the excellent job that he had been doing all along. There continued to be friction. The HUD requires the honoring of what it calls a bright line. There has to be separation for HUD to be satisfied between the operations of the mortgage bankers, the production people, and the operations of the underwriters. The mortgage people can't exercise influence over the underwriters, or HUD has to worry that the underwriting recommendation will be tainted by the people who are making the money off of the loans that get approved. Mr. Sherman had a track record from the beginning of bringing bright line violations or his concerns about potential bright line violations to the attention of the mortgage bankers and of his superiors, in particular Mr. Long. But when the confrontation between Mr. Sherman and Mr. Long directly over Mr. Long's conduct occurred, that was the beginning of the end for Mr. Sherman. A year later, Mr. Long had, there is now some documentation of Mr. Sherman's purported shortcomings as the manager of the underwriting department, and Mr. Sherman, in due time, was replaced. He was replaced in October. There is an internal memorandum written by Mr. Long on June 28th of 2016 that clearly contemplates firing him, recommends firing him, but also considers other alternatives. The district court declined to consider Mr. Sherman's protected activity, protected conduct, occurring after June 28th because of the June 28th memo, which equivocates about exactly what we're going to do with Mr. Sherman. It is our position in the brief that that subsequent activity also should be considered. It's evidence of that retaliation and Mr. Sherman's engagement in protected activity was the sole reason for his termination. I'm into my rebuttal time, but to summarize, our position is that there is a narrative that is amply supported by the evidence, and this is summary judgment, and the narrative that is supported by the evidence in Mr. Sherman's favor is he was hired for a particular reason to do a particular job, which was be the cop, and he did it extraordinarily well right up until the time that he was fired, right through the summer of 2016. There is evidence that the company, that the ambition to increase revenues and have a less rigid, a more flexible, that is more compliant with the mortgage bankers, a person of that description replaced Mr. Sherman is the reason that he was fired. And a jury should decide whether that was the sole motivation for Mr. Sherman's termination. Thank you, Your Honor. Very well. Thank you for your argument. Mr. Banks, we'll hear from you. Yes, Your Honor. May it please the Court, Michael Banks for Brocadia. Would you like me to address the ceiling question first before argument? That would be fine. I'll be very brief. There were a number of materials in the district court that were placed under seal because they were confidential business information, for the most part, given the passage of time. I don't think it's necessary that those remain under seal. There was one issue, though. There was a discovery dispute in district court involving Brocadia's obligation to produce a privileged email from its in-house counsel, or excuse me, a privileged memorandum. The district court Judge Sippel ruled that that should be produced, but it would not be a broad waiver and that its use would be limited to this case. I don't believe the entirety of the briefs need to be under seal, but so as to avoid a broader waiver, perhaps we could submit to the court, if the court would prefer, redacted versions of the briefs that just remove any substantive reference to what is in that internal report. If the court would prefer, we can do that. All right. Well, we'll confer on that and put out an order along those lines if we'd like you to do so. You're saying you think the most you would seek to seal at this point would be a portion of the brief that refers to this privileged document that could be redacted? If we're just talking about the briefs rather than the appendix, yes, Your Honor. Just we would black out any substantive references to what is in that memorandum. The appendix, there would be just certain pages that would need to be sealed? We could resubmit, yes, whichever volume of the appendix contains that memorandum. All right. Well, we may want to communicate with you about that because these, as you know, are public proceedings and there's a presumption that the material should be publicly, not that there will be a rush by the newspapers to get the briefs of this case, but you never know. I'm sorry. I noticed my clock started to run as we were discussing that. I didn't know if that was considered part of my argument. Why don't we see how it goes? If you need two more minutes at the end, we'll try to be charitable. Thank you. I hope that I don't. This FCA retaliation claim is actually quite narrow, as this Court has recognized. It is not intended to cover merely an employee who objects to issues relating to the administration of a government program.  The first is whether the FCA is implicated at all. The False Claims Act applies to one who makes a false or fraudulent claim for payment by the government. If there is an FCA issue, then the second question, of course, is whether the individual was subjected to retaliation in the form of a discharge solely for opposing the submission of a false claim for payment. Mr. Gross focused on the fourth element, the termination question. I will address that as well. But as a threshold matter, I would submit that as a matter of law, there is no FCA issue at all here. Mr. Sherman did not at any time oppose the submission of a false claim to the government. In fact, in his capacity as the head of underwriting, he testified that all communications with HUD went solely through him. At appendix page 181, he testified, no one had dealings with HUD other than me. That's a quote. Nothing went to HUD that he did not approve, and he testified that he was never pressured to approve a submission to HUD that was false or incorrect in any way. That alone, your honors, should dispose of the False Claims Act issue in this case. In fact, this case is reminiscent of other cases that have come before this court, Shell v. Blue Bird Media, by way of example, and Green v. City of St. Louis, both Eighth Circuit cases. In the Shell case, the plaintiff complained about the way a federal grant was administered. He thought it was administered improperly and that his employer may not be honoring obligations to the government under that grant. The court affirmed the entry of summary judgment, noting that the plaintiff was doing his job in identifying issues, just as the plaintiff in our case, Mr. Sherman, did his job in identifying issues, but he was not opposing a false claim for payment that his employer was making to the government. The same in Green, where the plaintiff had complained about flawed policies and reports relating to the use of government funds, but there was no false claim at issue. Mr. Gross identified the Rancho loan. There are two loans referenced in his brief and discussed extensively by Judge Sippel, the Rancho loan and the Calabash loan, and if I may, I'll briefly address each. There is most definitely no objection to a false claim in the Rancho case. Rancho involved a loan that had been submitted to HUD for approval. It was approved, and thereafter, Berkadia and the borrower sought to increase the size of the loan by another $10 million. It was referred to as upsizing. Mr. Gross just said that Mr. Sherman testified in his deposition that he did not learn of this upsizing until July 10, which was 14 days after the closing on June 26. That is what Mr. Sherman testified to, but as Judge Sippel noted, Mr. Sherman's testimony was objectively and demonstrably false. We produced an email that Mr. Sherman admits he received. That email is in the appendix in this case. It's July 20, 2015. Three weeks before the loan closed, Mr. Long, who has been identified as the bad guy by Mr. Sherman, forwarded Mr. Sherman an email trail that specifically referenced the June 26 closing. That email, by the way, is in the appendix at pages 346 and 47. It may be that Mr. Sherman did not read the entirety of the email. It may be he forgot about it in not going down the trail, but his loud and vociferous accusation against Mr. Long, accusing Mr. Long of deliberately concealing information from him as the HUD underwriter, was false. Judge Sippel cited that in his opinion at page 12, and it is out there for everyone to see objectively. Beyond that, there is no issue whatsoever of a false claim related to the upsizing of the Rancho loan. We know that from Mr. Sherman himself. When Mr. Sherman was reminded on July the 10th, after the loan had closed, about the transaction and the upsizing, he wrote to HUD. This is on page 210 of the appendix. This is what Mr. Sherman said to HUD. He wrote that the loan had closed, that the increase did not undermine the integrity or independence of the underwriting, nor did it circumvent the program requirements. It was a good loan, Mr. Sherman assured HUD. So where is the fraud on the government? Where is the fraudulent claim for government money? There is none, as Judge Sippel recognized. The same is true as to the Calabash loan, which Mr. Gross did not mention in his argument, but which is featured prominently in the briefs. The Calabash loan involved a communication with the government in 2013 that Mr. Sherman now objects to. He says the communication was incomplete and did not advise the government fully of some erroneous representations that had been made three years earlier to the government with the loan application in 2010. The loan took place at a time before Mr. Sherman even joined Berkadia. The timeline on this is quite important, Your Honors, because you have several distinct pieces. The 2010 loan defaulted in 2012, at which time it was assigned to the government. That's when Berkadia made its claim for government payment. It took the loan that it defaulted and said to the government, we now want you to step in. That's what HUD does. It effectively insures the loan. The error in the 2010 submission, as Mr. Sherman concedes, was not discovered until 2013. In 2013, it was learned that there were some fees that were not included in the original loan application. Mr. Sherman believes there should have been more said to the government. He's wrong, as Judge Sippel noted, that communication to the government was accurate. But that's not due to the FCA deficiency in his focus on the Calabash loan. The memorandum that was sent to the government in 2013, a year after HUD picked up the loan, was not a claim for payment by the government. On the contrary, Berkadia wrote to the government and said, we just discovered that our 2010 application was wrong. We are offering to take this loan off your hands. We will no longer ask the government to be responsible for the default and financial consequences. We will buy back the loan, and that's what Berkadia did. That's not a claim for payment by the government. It is actually a responsible corporate citizen like Berkadia going to the government and saying, we will ensure that because our loan papers three years ago were wrong, that we will make you whole and absolve you from any financial responsibility. So there's no false conduct associated with that. Mr. Gross also mentioned the issue of Brightline violations. The Brightline is an informal rule adopted by HUD that says that people who generate business are not to be too involved in the underwriting capacity. They may not select, for example, appraisers. They may not select vendors and consultants. That's to be done by underwriting, and they can't dictate the scope of the underwriting, and that makes great sense. Underwriting is supposed to be independent of the production and revenue generation process. Underwriting ensures the integrity of the loan. What Mr. Sherman doesn't say is that any application was ever submitted to the government that violated HUD's Brightline informal rule. And, in fact, he could not say that because, as I mentioned earlier and as he testified, he was the only one who communicated with HUD, and every loan application went through him. So he's more like the plaintiffs in the Shell and Green cases that I mentioned earlier. He's someone who's saying to Mr. Long on occasion, Phil, we have people here on the production side who are a little too aggressive. They're trying to get involved in underwriting. Now, as Judge Sippel noted, Mr. Long responded, you're right. That can't happen. There's no evidence of a retaliatory animus for that. But beside that, that is not opposition to a false claim. That's more questions raised about the administration of a program within Berkadia and general compliance with guidelines. So when you look at this case, you can see quite clearly that there is no protected activity in that there is no false claim submitted to the government. Nevertheless, we should address the termination issue, what Mr. Gross referred to as the fourth prong, whether there's evidence suggesting that Mr. Sherman was terminated for solely because he opposed the submission of a false claim. I won't go through all the evidence because it's quite detailed, but I will just summarize briefly if I may. Mr. Sherman did many things well, and he was praised mightily and frequently by Mr. Long for that. He did a marvelous job of restoring credibility with HUD and in overseeing the process of submissions to HUD. He has not identified a single instance in which he was disciplined or criticized for his role in approving loans or any loans that he rejected for submission to HUD. The problem, though, was his leadership in the department, the significant lag time. Bercadia was taking twice as long as industry standards to process HUD loan applications and his friction with others. That was noted back to 2014. Bercadia brought in an outside consultant, John Norton, to address the issues. With the head of production and Mr. Sherman, Mr. Norton conducted 35 interviews in 2014, two years before the termination. He then spent months analyzing this and making recommendations. The outside consultant, who had no role in the loan application or approval process, began to conclude after extensive coaching with Mr. Sherman that his efforts were not working, that Mr. Sherman was fatally resistant to change and would never get over his friction with Mr. Irvin, the head of production. Mr. Norton, the outside consultant, began to recommend termination. And as these problems were brought to Mr. Sherman's attention, Mr. Sherman reacted quite badly by any objective measure. In the spring of 2016, when matters were brought to his attention, he took a previously unannounced and unanticipated one week off from work. He just left and said, I need off from work. Mr. Long wrote to him and said, you're not resigning, are you? Because Mr. Long at that point didn't want to lose him. It got worse. In plaintiff's appellate brief and the reply brief, there's a reference to a piece of an email that Mr. Sherman sent on May 19th, but not the entirety or not the key part. This is May 19th of 2016. It's at appendix page 306. Mr. Sherman wrote to Mr. Long, If Mr. Irvin remains the head of production, and this next part is a quote, you should tee up the next organizational change announcement with my name. In other words, he said blatantly, if you keep the head of production, who by all accounts was doing a spectacular job, it's him or me. I'm gone. He also wrote that he had been staying because of his team, but he said to Mr. Long, Is that enough to keep me in this environment? Not a chance. So at the same time that Mr. Norton, the consultant, Mr. Jensen, the chief financial officer, and Mr. Long were all concluding that Mr. Sherman, over a period of two years, had been resistant to change, would not improve his underwriting department, and was in the midst of irreconcilable friction with the head of production, Mr. Sherman was saying, You must fire other people or I go and I'm threatening to leave. It was in that context that the decision was made. I submit there is absolutely no evidence to suggest that a retaliatory animus played any part in the decision making, let alone that it was the sole reason. This history was not disputed. Mr. Sherman did not contend that these statements were, that these discussions never took place. He speculates, he accuses, I'm sure he disagrees with the decision and believes it was unwise, but that's not enough to state a claim under federal or state law. Mr. Gross did not address the common law claim. I'll be very brief on that. The common law standard is a little bit different. But again, it requires, under Missouri law, a showing of a well-established and clearly mandated public policy at issue. There is no statute or regulation at issue here other than the False Claims Act. And as we demonstrated, the False Claims Act is not in this case. Your Honors, unless you have questions for me, I see that I won't need the additional two minutes. So thank you for allowing me to present the argument. Thank you for your argument. Mr. Gross, we'll hear from you in rebuttal. Thank you, Your Honor. The June 3rd email message that purportedly notified Mr. Sherman of the expansion of the bridge loan, that information was in the archive of that email. That wasn't the message from Mr. Long to Mr. Sherman. It was in the trail that, if you read far enough down, you would see somebody saying, we've got this bridge loan expansion scheduled to close on June 26th. The event that had to be reported was the actuality of the loan. The loan actually closed on June 26th. Mr. Long's email message at that time saying, good job, everybody, went to the production people and did not go to Mr. Sherman. On July 9th or July 10th is when Mr. Sherman and Mr. Long had an exchange of email in which Mr. Sherman said, did this thing close on June 26th and got angry because he hadn't known about it and hadn't been able to do the reporting on time. So if this appeal, if his underlying claim is going to turn on whether he read far enough down into the archive of the email message, he knew about it on June 3rd, except his testimony was, which a jury might believe or not believe, that he didn't. He read through it, and it did not register with him that the loan was going to happen. It's scheduled for closing, but loans get scheduled and don't get scheduled. Mr. Long subsequently testified that his communication on that issue had been poor with Mr. Sherman. The notion that the Bright Line Rule is some lax or unimportant concept is the opposite of the case. The Bright Line Rule is HUD's way of, one of HUD's ways of trying to ensure compliance. Keep the guys who are pushing the deal out of the evaluation of whether the deal is in compliance with federal law. In the Berkadia manual for these loans, the reference to the Bright Line Rule occurs in boldface perhaps 10 times. It's a crucial part of Mr. Sherman's job. Mr. Sherman's job is a crucial part of Berkadia's business and ability to keep making federally insured loans. And there was constant tension about this subject. When Mr. Long and Mr. Sherman had their terminal conversation, Mr. Long told Mr. Sherman, you're fired, October of 2016. Mr. Sherman said, why am I being fired? What is it? And Mr. Long was evasive and then eventually said, you did yourself no favor by going to the board. And that was a reference to Mr. Sherman having gone to the board, two members of the board, and told them about his concern that Mr. Long had withheld information about the bridge loan expansion, which was Mr. Long's own loan. I'm about out of time. If there aren't any questions, I thank the court for its attention. Thank you, Mr. Gross. Thank you to both counsel or all counsel. And the case is submitted. The court will file an opinion in due course. Thank you for your appearance, and you may be excused.